**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| MOHAMMED ELZAGHA, Individually and On Behalf of All Others Similarly Situated, ) ) ) ) | |
| Plaintiff, ) | **CIVIL ACTION NO.** |
| ) ) | |
| vs. ) ) ) ) | |
| WILMINGTON TRUST CORPORATION, TED T. CECALA, ROBERT V.A. HARRA, JR., DAVID R. GIBSON, KEVYN N. RAKOWSKI, DONALD E. FOLEY, CAROLYN S. BURGER, R. KEITH ELLIOTT, LOUIS J. FREEH, GAILEN KRUG, REX L. MEARS, STACEY J. MOBLEY, MICHELE M. ROLLINS, OLIVER R. SOCKWELL, ROBERT W. TUNNELL, JR., SUSAN D. WHITING, J.P. MORGAN SECURITIES and KEEFE, BRUYETTE & WOODS, INC., ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) | |

**CLASS ACTION COMPLAINT**

Plaintiff, Mohammed Elzagha ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wilmington Trust Corporation ("Wilmington Trust" or the "Company") and securities analysts' reports and advisories about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of investors who purchased or otherwise acquired Wilmington Trust securities between April 18, 2008 and October 29, 2010, inclusive (the "Class Period"), including purchasers of the Company's securities pursuant or traceable to the Company's public equity offering on or about February 23, 2010.   The action seeks remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Wilmington Trust is a financial services holding company that provides regional banking services throughout the mid-Atlantic region, wealth advisory services to high-net-worth clients in 36 countries, and corporate client services to institutional clients in 89 countries. The Company's wholly owned bank subsidiary, Wilmington Trust Company, which was founded in 1903, is one of the largest personal trust providers in the United States and the leading retail and commercial bank in Delaware.   A large concentration of the Company's loans related to developers building in Delaware, especially near beach communities.   As a result of the deteriorating economy, these areas experienced eroding housing prices, and the anticipated demand for these projects plummeted.

3.      On November 1, 2010, Wilmington Trust stunned investors when it issued two related press releases.  First, Wilmington Trust announced dismal results for the third quarter of 2010, reporting a loss of $365.3 million.  The Company stated that a primary cause for the loss was continued deterioration in the Company's loan portfolio, reflecting the extent of the Company's exposure to real estate construction lending concentrated in Delaware.  Wilmington Trust further stated that it had "little assurance" that its loan portfolio would strengthen significantly in the near term, or that the Company's capital position would not erode further.

Second, Wilmington Trust announced that it would merge with M&T Bank Corporation ("M&T"), with the two companies having signed a definitive merger agreement. Under the terms of the merger agreement, Wilmington Trust common shareholders would receive 0.051372 shares of M&T common stock in exchange for each share of Wilmington Trust common stock. Most shockingly, the transaction was valued at $3.84 per Wilmington Trust share, representing 1.0x tangible book value as of September 30, 2010. The prior trading day, October 29, 2010, Wilmington Trust stock had closed at $7.11 per share, an amount Wilmington Trust shareholders were led to believe represented the true value of the Company.

4.     Upon the release of this news, shares of the Company's stock fell $2.90 per share, or 40.79 percent, to close on November 1, 2010 at $4.21 per share, on unusually heavy trading volume.

5.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that Wilmington Trust was failing to take timely, adequate and required impairments and accounting write-downs, particularly in its construction-loan portfolio; (2) that as a result, Wilmington Trust's financial statements materially overstated the Company's assets;  (3) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements and public statements regarding the Company's financial results were materially false and misleading at all relevant times.

6.     Additionally, for these reasons, the Company's Registration Statement and other materials (the "Offering Materials") issued in connection with Wilmington Trust's February 23,

2010 public equity offering (the "Offering") were false and misleading at all relevant times.

7.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members suffered damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.      Venue is proper in this District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, Wilmington Trust's principal executive offices are located within this District, and the Company is incorporated in this District.

11.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## PARTIES

12.      Plaintiff, Mohammed Elzagha, as set forth in the accompanying certification, incorporated by reference herein, purchased Wilmington Trust securities at artificially inflated

4

prices during the Class Period and has been damaged thereby.

13.     Defendant Wilmington Trust is a Delaware corporation with its principal executive offices located at Rodney Square North, 1100 North Market Street, Wilmington, Delaware.

14.     Defendant Ted T. Cecala ("Cecala") was, at relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

15.     Defendant Robert V.A. Harra, Jr. ("Harra") was, at relevant times, the Company's President, Chief Operating Officer ("COO") and a director.

16.     Defendant David R. Gibson ("Gibson") was, at relevant times, the Company's Executive Vice President and Chief Financial Officer ("CFO").

17.     Defendant Kevyn N. Rakowski ("Rakowski") was, at relevant times, the Company's Senior Vice President and Controller.

18.     Defendant Donald E. Foley ("Foley") was, at relevant times, the Company's CEO, Chairman and a member of the Board of Directors.  Foley was a director at the time of the Company's Offering, and signed the false and misleading Form 10-K filed with the SEC on February 22, 2010 (the "2009 Form 10-K") that was incorporated by reference into the Offering Materials.

19.     Defendants Cecala, Harra, Gibson, Rakowski and Foley are collectively referred to hereinafter as the "Officer Defendants."  The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Wilmington Trust's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to,

or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Officer Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Officer Defendants.

20.     Defendant Carolyn S. Burger ("Burger") was, at relevant times, a member of the Company's Board of Directors.  Burger was a director at the time of the Company's Offering, and signed the false and misleading 2009 Form 10-K that was incorporated by reference into the Offering Materials.

21.     Defendant R. Keith Elliott ("Elliott") was, at relevant times, a member of the Company's Board of Directors.  Elliott was a director at the time of the Company's Offering, and signed the false and misleading 2009 Form 10-K that was incorporated by reference into the Offering Materials.

22.     Defendant Louis J. Freeh ("Freeh") was, at relevant times, a member of the Company's Board of Directors.  Freeh was a director at the time of the Company's Offering, and signed the false and misleading 2009 Form 10-K that was incorporated by reference into the Offering Materials.

23.     Defendant Gailen Krug ("Krug") was, at relevant times, a member of the Company's Board of Directors.  Krug was a director at the time of the Company's Offering, and signed the false and misleading 2009 Form 10-K that was incorporated by reference into the Offering Materials.

24.     Defendant Rex L. Mears ("Mears") was, at relevant times, a member of the Company's Board of Directors.  Mears was a director at the time of the Company's Offering, and signed the false and misleading 2009 Form 10-K that was incorporated by reference into the Offering Materials.

25.     Defendant Stacey J. Mobley ("Mobley") was, at relevant times, a member of the Company's Board of Directors.  Mobley was a director at the time of the Company's Offering, and signed the false and misleading 2009 Form 10-K that was incorporated by reference into the Offering Materials.

26.     Defendant Michele M. Rollins ("Rollins") was, at relevant times, a member of the Company's Board of Directors.  Rollins was a director at the time of the Company's Offering, and signed the false and misleading 2009 Form 10-K that was incorporated by reference into the Offering Materials.

27.     Defendant Oliver R. Sockwell ("Sockwell") was, at relevant times, a member of the Company's Board of Directors.  Sockwell was a director at the time of the Company's Offering, and signed the false and misleading 2009 Form 10-K that was incorporated by reference into the Offering Materials.

28.     Defendant Robert W. Tunnell, Jr. ("Tunnell") was, at relevant times, a member of the Company's Board of Directors.  Tunnell was a director at the time of the Company's Offering, and signed the false and misleading 2009 Form 10-K that was incorporated by reference into the Offering Materials.

29.     Defendant Susan D. Whiting ("Whiting") was, at relevant times, a member of the Company's Board of Directors.  Whiting was a director at the time of the Company's Offering, and signed the false and misleading 2009 Form 10-K that was incorporated by reference into the

Offering Materials.

30.     Defendants Cecala, Harra, Gibson, Rakowski, Burger, Elliott, Foley, Freeh, Krug, Mears, Mobley, Rollins, Sockwell, Tunnell and Whiting are collectively referred to hereinafter as the "Individual Defendants."

31.     Defendant J.P. Morgan Securities ("J.P. Morgan") was an underwriter of the Company's Offering.

32.     Defendant Keefe, Bruyette & Woods, Inc. ("KBW") was an underwriter of the Company's Offering.

33.     Defendants J.P. Morgan and KBW are collectively referred to hereinafter as the "Underwriter Defendants."   The Underwriter Defendants served as financial advisors, and assisted in the preparation and dissemination of the Offering Materials.

## SUBSTANTIVE ALLEGATIONS

### Background

34.     Wilmington Trust is a financial services holding company that provides regional banking services throughout the mid-Atlantic region, wealth advisory services to high-net-worth clients in 36 countries, and corporate client services to institutional clients in 89 countries. The Company's wholly owned bank subsidiary, Wilmington Trust Company, which was founded in 1903, is one of the largest personal trust providers in the United States and the leading retail and commercial bank in Delaware.   A large concentration of the Company's loans related to developers building in Delaware, especially near beach communities.   As a result of the deteriorating economy, these areas experienced eroding housing prices, and the anticipated demand for these projects plummeted.

## Materially False and Misleading
## Statements Issued During the Class Period

35.    The Class Period begins on April 18, 2008, with the Company's issuance of a press release entitled "Wilmington Trust Announces 2008 First Quarter Results."  At March 31, 2008, the Company reported real estate-construction loans to be approximately $1.8 billion.  This press release also set forth, in relevant part:

> Wilmington Trust Corporation (NYSE: WL) reported today that earnings for the 2008 first quarter were $0.62 per share (on a diluted basis), the same as for the year-ago first quarter. Net income for the 2008 first quarter was $41.4 million, compared to $43.0 million for the year-ago first quarter.
>
> \*          \*          \*
>
> [Defendant Cecala stated]: "Our first quarter results demonstrate, once again, how our diversified business mix helps us generate consistent results, even in the face of a challenging interest rate environment."
>
> \*          \*          \*
>
> **Loan portfolio**
>
> • Loans totaling more than $321 million were added during the first three months of 2008, the largest three-month increase since the first quarter of 2006.
>
> • Most of this growth was in the commercial portfolio. Commercial loan balances topped $6 billion for the first time (on a period-end basis). On average, commercial balances reached $5.94 billion, which was 8% higher than for the year-ago first quarter, and 4% higher than for the 2007 fourth quarter.
>
> \*          \*          \*
>
> **Credit quality in the 2008 first quarter**
>
> • In the internal risk rating analysis, 96% of total loans outstanding had pass ratings.
>
> • Compared to the 2007 fourth quarter:
>
> • Loan balances were $321.6 million higher (on a period-end basis).

> • At $4.7 million, net charge-offs were $5.0 million lower and the
> net charge-off ratio was 7 basis points lower.

36.     On May 12, 2008, the Company filed its Quarterly Report with the SEC on Form

10-Q.  The Company's Form 10-Q was signed by Defendants Cecala and Gibson and reaffirmed

the Company's financial results previously announced on April 18, 2008.   Additionally, the

Form 10-Q stated:

> • *Loans.* We do not record loans at fair value on a recurring basis.
> We record fair value adjustments to loans on a nonrecurring basis
> to reflect full and partial charge-offs due to impairment. We carry
> fully charged-off loans at zero on our balance sheet. For impaired
> loans, we use a variety of techniques to measure fair value, such as
> using the current appraised value of the collateral and discounting
> the contractual cash flows.
>
> *       *       *
>
> **Commercial Loans**
> Commercial loan balances exceeded $6.0 billion for the first time,
> as we added $219.2 million of commercial loans during the first
> three months of 2008. This was an increase of 4% from year-end
> 2007.
>
> *       *       *
>
> We have a high degree of confidence in the integrity of our
> commercial construction portfolio, because:
> • We focus on clients with privately held or family-owned
> businesses. We do not lend to large, national homebuilders.
> • The geographic scope of our commercial lending activity is
> concentrated in the mid-Atlantic region. This region has not
> experienced the volume of speculative over-building seen in other
> parts of the United States.

37.     The Company's Form 10-Q also contained Sarbanes-Oxley required

certifications, signed by Defendants Cecala and Gibson, who stated:

> I, [Ted T. Cecala/David R. Gibson] of Wilmington Trust
> Corporation, certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of
> Wilmington Trust Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely

to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*        *        *

The undersigned certify that, to their knowledge, the Form 10-Q of Wilmington Trust Corporation (the Corporation) for the first quarter of 2008 fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and that the information contained in that report fairly presents, in all material respects, the financial condition and results of operation of the Corporation.

38.     On July 18, 2008, the Company issued a press release entitled "Wilmington Trust Announces 2008 Second Quarter Results."  In the press release, the Company reported real estate-construction loans at June 30, 2008 of approximately $1.847 billion.  The press release set forth, in relevant part:

Wilmington Trust Corporation (NYSE: WL) reported a loss of $19.5 million, or $0.29 per share, for the 2008 second quarter.

*        *        *

Wilmington Trust's capital position remained strong.  All regulatory capital ratios continued to exceed the amounts required by the Federal Reserve Board to be considered a well-capitalized

institution. The two impairment charges did not affect client funds or the company's ability to pay dividends.

\* \* \*

**Significant factors in second quarter 2008 results**
• The Regional Banking business added $483.0 million of loans during the 2008 second quarter. This was the largest three-month increase in the company's history. Loan balances topped $9 billion for the first time, on both a period-end and average-balance basis. Loan growth reflected the resilience of the well-diversified economy in the mid-Atlantic region, which has not experienced the levels of unemployment and housing pressure seen in some other parts of the United States.

\* \* \*

**Credit quality in the 2008 second quarter**
No negative systemic credit quality trends emerged during the second quarter, but the combination of loan growth and downgrades in the internal risk rating analysis caused the provision and reserve for loan losses to increase.

Total nonperforming assets increased to $88.5 million from $77.7 million at March 31, 2008. Three credits – a commercial construction loan, a loan to a retailer, and a loan to a textile manufacturer – accounted for the majority of this $10.8 million increase. The nonperforming asset ratio was 95 basis points, the same as at year-end 2007.

Given the unpredictability of commercial loan charge-offs, management does not believe the 2008 second quarter net charge-off ratio indicates a trend, and expects the net charge-off ratio to remain within its historical range of 24 to 31 basis points over a 12-month period.

\* \* \*

The percentage of loans with pass ratings in the internal risk rating analysis improved to 96.28% from 95.62% at March 31, 2008, largely due to loan growth.

On a percentage basis, the composition of the loan portfolio remained well diversified and relatively unchanged.

39.     On August 11, 2008, Wilmington Trust filed its Quarterly Report with the SEC on

Form 10-Q.  The Company's Form 10-Q was signed by Defendants Cecala and Gibson, and

13

reaffirmed the Company's financial results previously announced on July 18, 2008.   The

Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially

similar to the certifications contained in ¶ 37, *supra*.   Additionally, the Form 10-Q stated, in

relevant part:

> [At June 30, 2008, Real Estate-construction loans represented 20%
> of the loan portfolio]
>
>         \*        \*        \*
>
> Commercial construction balances continued to increase, albeit at a
> much slower pace than in prior periods, and were 4% higher than
> at year-end 2007. At $1.85 billion, commercial construction loans
> accounted for 20% of total loans at June 30, 2008, down from 21%
> at year-end 2007. ***Most of the loans in the portfolio continued to
> be for residential construction, primarily for single-family
> homes, in Delaware.***
>
>         \*        \*        \*
>
> We have a high degree of confidence in our commercial
> construction portfolio and its integrity, because:
> • We focus on clients with privately held or family-owned
> businesses that are well established and successful. We do not lend
> to large, national homebuilders.
> • The geographic scope of our commercial lending activity is
> concentrated in the mid-Atlantic region. This region has not
> experienced the volume of speculative over-building seen in other
> parts of the United States. ***Generally, projects we fund are within
> a two-hour drive from our headquarters in Wilmington,
> Delaware.***
> • ***Most of the construction loans in our portfolio are for single-
> family homes in residential tract developments. Population
> growth is driving the demand for this type of housing and related
> services. We do very little condominium construction or
> conversion financing.*** [Emphasis added.]

40.     On October 17, 2008, the Company issued a press release entitled "Wilmington

Trust Announces 2008 Third Quarter Results."   At September 30, 2008, real estate-construction

loans were reported to be approximately $1.908 billion.   This press release set forth, in relevant

part:

Wilmington Trust Corporation (NYSE: WL) reported net income of $22.9 million for the 2008 third quarter, or $0.34 per share (on a diluted basis).

\*       \*       \*

On an operating basis (excluding the securities loss), net income for the 2008 third quarter was $35.4 million, or $0.53 per share (on a diluted basis). Management believes that operating results present a more relevant measure of ongoing business trends and offer a better basis of comparison with prior periods . . .

"In the face of extraordinary market conditions, we continued to focus on our clients, our business plan, and opportunities for growth, and these efforts were evident in all three of our businesses," said Ted T. Cecala, Wilmington Trust chairman and chief executive officer. "Compared to the year-ago third quarter, advisory revenue was up 14%, and loan balances were 15% higher, on average. In addition, the net interest margin stabilized, and credit quality remained in line with our historical experience."

\*       \*       \*

**Regional Banking**
• The Regional Banking business continued to benefit from economic conditions in the mid-Atlantic region, where unemployment rates remained below the U.S. average. Delaware's unemployment rate for August 2008 (the most recent data available) was 4.9%, compared with the U.S. average of 6.1%. The August unemployment rate was 5.8% for Pennsylvania, 5.9% for New Jersey, and 4.5% for Maryland.
• Loan balances, on average, were $9.46 billion. This was 15% higher than for the year-ago third quarter, and 4% higher than for the 2008 second quarter.
• At period-end, loan balances were $9.59 billion, up 15% year-over-year and up 3% from the 2008 second quarter. The Delaware market accounted for approximately 54% of total period-end loans; the Pennsylvania market accounted for approximately 24%; and the Maryland market accounted for approximately 10%.
• Commercial loan balances were $6.55 billion, on average, for the 2008 third quarter. This was 17% higher than for the year-ago third quarter, and 5% higher than for the 2008 second quarter. At period-end, commercial loan balances were $6.67 billion. The Delaware market accounted for approximately 55% of commercial loans at period-end; the Pennsylvania market accounted for approximately 27%; and the Maryland market accounted for approximately 9%.

\*       \*       \*

**Credit quality in the 2008 third quarter**

Compared to the 2008 second quarter, net charge-offs decreased, but nonperforming asset levels increased. The combination of this increase and loan growth, plus risk rating downgrades, caused the provision and reserve for loan losses to increase. The percentage of loans with pass ratings in the internal risk rating analysis remained at 96%.

The provision for loan losses was $19.6 million, up from $18.5 million for the 2008 second quarter. The reserve for loan losses increased to $122.2 million from $113.1 million at June 30, 2008. The loan loss reserve ratio increased 5 basis points from the 2008 second quarter to 1.27%.

41.     On November 10, 2008, Wilmington Trust filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Defendants Cecala and Gibson, and reaffirmed the Company's financial results previously announced on July 23, 2010. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 37, *supra*. Additionally, the Form 10-Q stated, in relevant part:

[At September 30, 2008, real estate-construction loans represented 20% of the loan portfolio]

\*       \*       \*

We have a high degree of confidence in our commercial construction portfolio and its integrity, because:
• We focus on clients with privately held or family-owned businesses that are well established and successful.
We do not lend to large, national homebuilders.
• The geographic scope of our commercial lending activity is concentrated in the mid-Atlantic region. This region has not experienced the volume of speculative over-building seen in other parts of the United States.

\*       \*       \*

Net charge-offs for the 2008 third quarter were $1.3 million lower than for the 2008 second quarter, mainly because there were no commercial construction loan charge-offs. There was a $2.0 million increase in commercial, financial, and agricultural loan charge-offs. This increase was associated mainly with one previously nonaccruing loan to a sports equipment retailer.

42.     On January 30, 2009, the Company issued a press release entitled "Wilmington Trust Announces 2008 Fourth Quarter Results."  At December 31, 2008, the Company reported real estate-construction loans to be approximately $1.9 billion.  The press release set forth, in relevant part:

> Wilmington Trust Corporation (NYSE: WL) reported a loss for the 2008 fourth quarter of $68.5 million, or $1.02 per share.
>
> *        *        *
>
> • The company recorded a loss for the 2008 fourth quarter of $6.1 million, or $0.10 per share, due to the high level of the provision for loan losses.
>
> • Full-year results were positive. Operating net income for the 2008 full year was $102.8 million, or $1.51 per share (on a diluted basis).
>
> *        *        *
>
> For the 2008 fourth quarter, the provision for loan losses was $67.5 million; for the 2008 full year, it was $115.5 million. In comparison, for 2007, the provision was $9.2 million for the fourth quarter and $28.2 million for the full year.
>
> *        *        *
>
> At December 31, 2008, the reserve for loan losses was $157.1 million, or 1.63% of total loans outstanding. In comparison, at September 30, 2008, the reserve was $122.2 million, or 1.27% of loans outstanding. At December 31, 2007, the reserve was $101.1 million, or 1.19% of loans outstanding.
>
> On a percentage basis, the composition of the loan portfolio was the same as at September 30, 2008, and relatively unchanged from year-end 2007.

43.     On March 2, 2009, Wilmington Trust filed its Annual Report with the SEC on Form 10-K.  The Company's Form 10-K was signed by Defendants Cecala, Harra, Gibson, Rakowski, Burger, Elliott, Foley, Krug, Mobley, Rollins, Sockwell and Whiting, and reaffirmed the Company's financial results previously announced on January 30, 2009.  The Company's

Form 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 37, *supra*. Additionally, the Form 10-K stated, in relevant part:

> At December 31, 2008, our commercial real estate/construction portfolio totaled $1,923.8 million, or 20% of total loans outstanding.

44. On April 24, 2009, the Company issued a press release entitled "Wilmington Trust Announces 2009 First Quarter Results." At March 31, 2009, the Company reported real estate-construction loans to be approximately $1.96 billion. The press release set forth, in relevant part:

> Wilmington Trust Corporation (NYSE: WL) reported net income of $21.8 million for the first quarter of 2009. Earnings per common share were $0.26 on a diluted basis.
>
> "All of our businesses did well in the first quarter, but extraordinary economic and market conditions prevented the full extent of these successes from translating into higher earnings," said Ted T. Cecala, Wilmington Trust chairman and chief executive officer. "Amid the current disruption in our industry, clients are increasingly attracted to our relationship focus and financial stability, but we are battling the interest rate environment, economic uncertainty, and market volatility."
>
> The company's capital position remained strong. All regulatory capital ratios continued to exceed the amounts required by the Federal Reserve Board to be considered a well-capitalized institution, and all were higher than for any quarter in 2008.
>
> \*     \*     \*
>
> • Total loan balances of $9.52 billion, on average. This was 10% higher than for the 2008 first quarter, but 1% lower than for the 2008 fourth quarter. The linked-quarter decrease was due mainly to repayments of, and less demand for, consumer loans.
>
> \*     \*     \*
>
> **Regional Banking**
> Total loan balances were $9.52 billion, on average. This was 10% higher than for the 2008 first quarter, but 1% lower than for the 2008 fourth quarter. The linked-quarter decrease was due mainly to a decline in consumer loan balances. On a percentage basis, the

composition of the loan portfolio was relatively unchanged from the 2008 first and fourth quarters.

Commercial loan balances totaled $6.72 billion, on average. This was $780.5 million higher than for the 2008 first quarter, but $12.8 million less than for the 2008 fourth quarter. On a linked-quarter basis, commercial and industrial loans (recorded as commercial, financial, and agricultural loans) decreased 4%, commercial construction loans increased 1.5%, and commercial mortgage loans increased 4%, on average.

**Credit quality**
Total net charge-offs were $21.2 million, down from $25.5 million for the 2008 fourth quarter, as commercial construction, commercial mortgage, and retail net charge-offs all decreased. This brought the net charge-off ratio to 22 basis points, down from 27 basis points for the 2008 fourth quarter.

45.     On May 11, 2009, Wilmington Trust filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Cecala and Gibson, and reaffirmed the Company's financial results previously announced on April 24, 2009.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 37, *supra*.  Additionally, the Form 10-Q stated, in relevant part:

Total commercial loan balances decreased slightly during the first three months of 2009, as declines in commercial, financial, and agricultural (C&I) loans offset increases in commercial construction and commercial mortgage loan balances. The decline in C&I balances reflected client reticence amid uncertain economic conditions.

\*       \*       \*

Total net charge-offs were $21.2 million, down from $25.5 million for the 2008 fourth quarter, as commercial construction, commercial mortgage, and retail net charge-offs all decreased.

46.     On July 24, 2009, the Company issued a press release entitled "Wilmington Trust Announces 2009 Second Quarter Results."  At June 30, 2009, the Company reported real estate-

construction loans of approximately $1.962 billion.   The press release further set forth, in relevant part:

On an operating basis (excluding the securities impairment), net income for the 2009 second quarter was $8.8 million, and earnings per common share were $0.06. The financial statements in this release contain comparisons of reported results (including the write-down) and operating results (excluding the writedown). Management believes that operating results provide a more relevant and comparative basis on which to evaluate the company's performance.

Two other factors reduced earnings:
• An increase in the provision for loan losses, which rose to $54.0 million from $29.5 million for the 2009 first quarter. This increase was driven by higher levels of nonperforming assets and net chargeoffs, and downgrades in the internal risk rating analysis, as economic conditions in the mid-Atlantic region remained unsettled.

\*      \*      \*

Other key factors in 2009 second quarter results were:

\*      \*      \*

• Total loan balances of $9.40 billion, on average. This was 3% higher than for the year-ago second quarter, but 1% lower than for the 2009 first quarter. Commercial loan balances increased, while consumer loan balances decreased, due to repayments and lower demand.
• Total assets of $11.42 billion, on average, which was lower than for prior periods. The majority of this decrease was due to sales of securities in the investment portfolio.

\*      \*      \*

**Regional Banking**
Total loan balances were $9.40 billion, on average. This was 3% higher than for the year-ago second quarter, and 1% lower than for the 2009 first quarter. Increases in commercial loan balances were offset somewhat by decreases in consumer loan balances.

Commercial loans accounted for 73% of the portfolio at period end, up from 69% at the end of the year-ago second quarter and 71% at the end of the 2009 first quarter. The company makes commercial loans throughout the mid-Atlantic region, but concentrates its consumer lending activities in the state of Delaware.

Commercial balances reached a record-high of $6.73 billion, on average. This was $469.9 million, or 8%, higher than for the year-ago second quarter, and $10.8 million more than for the 2009 first quarter.

\* \* \*

***Most of the commercial mortgages added were for owner-occupied retail and professional office properties in Delaware and southeastern Pennsylvania.***

\* \* \*

Wilmington Trust does not engage in subprime residential mortgage lending.

\* \* \*

At June 30, 2009, the reserve for loan losses was $184.9 million, and the loan loss reserve ratio was 2.02%. In comparison, at March 31, 2009, the reserve was $167.0 million, and the loan loss reserve ratio was 1.77%.
Comparing the 2009 second quarter with the 2009 first quarter:
• The provision for loan losses was $54.0 million, up from $29.5 million.
• Net charge-offs were $36.2 million, up from $21.2 million.
• Commercial loans accounted for all of the increase in net charge-offs. Net charge-offs of consumer and other retail loans were 31% lower.
• The net charge-off ratio was 0.39%, an increase of 17 basis points. [Emphasis added.]

47.      On August 10, 2009, Wilmington Trust filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Cecala and Gibson, and reaffirmed the Company's financial results previously announced on July 24, 2009.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 37, *supra*.  Additionally, the Form 10-Q stated, in relevant part:

In the commercial construction portfolio, balances increased 2%, or $38.1 million, during the first six months of 2009.

*     *     *

In the commercial mortgage portfolio, balances increased 8%, or $141.6 million, during the first six months of 2009.

*     *     *

At June 30, 2009, serious-doubt loans totaled $57.9 million. This was $5.3 million more than at March 31, 2009, but $52.0 million, or 47%, less than at year-end 2008.

48.     On October 23, 2009, the Company issued a press release entitled "Wilmington Trust Announces 2009 Second Quarter Results."   At September 30, 2009, real estate-construction loans were reported to be approximately $1.95 billion. The press release further set forth, in relevant part:

> Wilmington Trust Corporation (NYSE: WL) reported a loss of $5.9 million, or $0.15 per diluted common share, for the third quarter of 2009. Earnings for the quarter were offset by $38.1 million of losses on securities in the company's investment portfolio. On an aftertax basis, these securities losses reduced net income by approximately $23.6 million and earnings by approximately $0.34 per diluted common share.

*     *     *

> Positive aspects of third quarter results included:
> *     *     *
> - A trailing-quarter decline in the provision for loan losses. The provision was $38.7 million, which was 28% lower than for the 2009 second quarter. Credit quality is discussed in more detail elsewhere in this release.
> *     *     *
> Total loan balances for the 2009 third quarter were $9.08 billion, on average.

*     *     *

> Commercial loan balances for the 2009 third quarter were $6.69 billion, on average. Within the commercial portfolio, commercial mortgage balances rose on a trailing quarter and year-over-year basis.

*     *     *

22

***These conditions produced mixed credit quality metrics.***
Compared to the 2009 second quarter, the provision for loan losses
as well as net charge-offs and the net charge-off ratio were lower,
while nonperforming assets and loans past due 90 days or more
were higher.

The provision for loan losses was $38.7 million, which was 28%
lower than the $54.0 million recorded for the 2009 second quarter.
The reserve for loan losses was $201.8 million, up 9% from $184.9
million at June 30, 2009. The higher reserve reflected additional
downgrades in the internal risk rating analysis, plus the increases
in nonperforming assets and loans past due 90 days or more.

At September 30, 2009, the loan loss reserve ratio was 2.24%, and
the nonperforming asset ratio was 4.39%. The reserve ratio differs
from the nonperforming asset ratio because an asset's
nonperformance does not automatically lead to a partial or total
loss.

The amount of the reserve reflects management's estimates of
probable losses. Those estimates are based on a combination of
past loss experience, qualitative adjustments to capture current
trends, and actual collateral measurements. The process
management uses to calculate the reserve follows specific
regulatory requirements and accounting rules.

"We prefer to work with borrowers to resolve repayment problems
instead of automatically charging off unpaid amounts.
Consequently, loans may remain on nonaccruing status for longer
periods," Mr. Cecala said. "Compared to many other banks, our
nonperforming asset levels are typically higher, but our net charge-
offs are typically lower. We believe the net charge-off ratio is the
most meaningful measure of credit quality, and we believe our
loan loss reserve is adequate."

Net charge-offs for the 2009 third quarter were $21.8 million,
which was 40% less than the $36.2 million recorded for the 2009
second quarter. The net charge-off ratio was 0.24% of total loans
outstanding. This was 15 basis points lower than the 0.39%
recorded for the 2009 second quarter. On an annualized basis, the
net charge-off ratio decreased to 0.96%. This was 60 basis points
lower than for the 2009 second quarter, when the annualized net
charge-off ratio was 1.56%.

Nonperforming assets totaled $397.5 million, which was $67.
million higher than at the end of the 2009 second quarter.

*       *       *

**Operating results**
On an operating basis, the company was profitable for the third quarter of 2009. Operating net income was $17.8 million, and operating earnings were $0.19 per diluted common share. Except for the securities losses, the dynamics that affected operating results for the 2009 third quarter were the same as the factors that affected reported results. [Emphasis added.]

49.    On November 9, 2009, Wilmington Trust filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Cecala and Gibson, and reaffirmed the Company's financial results previously announced on October 23, 2009.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 37, *supra*.

50.    On January 29, 2010, the Company issued a press release entitled "Wilmington Trust Announces 2009 Fourth Quarter Results." At December 31, 2009, the Company reported real estate-construction loans of approximately $1.956 billion. The press release set forth, in relevant part:

Wilmington Trust Corporation (NYSE: WL) reported a loss of $11.2 million for the 2009 fourth quarter and a loss of $4.4 million for the 2009 full year. The net loss available to common shareholders was $15.7 million for the 2009 fourth quarter and $22.7 million for the 2009 full year. On a fully diluted basis, the net loss available to common shareholders was $0.23 per share for the 2009 fourth quarter and $0.33 per share for the 2009 full year.

*       *       *

 "Our 2009 financial performance underscores the benefits of our diversified business model, as growth in revenue from our fee-based businesses mitigated the recession's negative effects on our banking business."

*       *       *

Net charge-offs for the 2009 fourth quarter were $33.1 million, which was $11.3 million higher than for the trailing quarter.

Commercial construction loans accounted for $6.8 million, or 60%, of this increase.

The net charge-off ratio was 0.37% for the 2009 fourth quarter and 1.21% for the full year.

Nonaccruing loans at December 31, 2009, were $455.6 million, an increase of $88.1 million from the trailing quarter. Commercial construction loans accounted for $74.1 million, or 84%, of this increase.

\*      \*      \*

At December 31, 2009, the reserve for loan losses was $251.5 million, compared with $201.8 million at September 30, 2009, and $157.1 million at the end of 2008. The loan loss reserve ratio rose to 2.80%, compared with 2.24% at September 30, 2009, and 1.63% at the end of 2008.

More than half of the increases in the provision and reserve for loan losses were associated with commercial construction loans in Delaware.

51.      On February 22, 2010, Wilmington Trust filed its Annual Report with the SEC on Form 10-K.   The Company's Form 10-K was signed by the Individual Defendants, and reaffirmed the Company's financial results previously announced on January 29, 2010.   The Company's Form 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 37, *supra*.   Additionally, the Form 10-K set forth, in relevant part:

When we doubt that we will be able to collect interest or principal, we stop accruing interest. We consider a loan impaired when it is probable that the borrower will be unable to pay all amounts due according to the contractual terms of the loan agreement.

**Reserve for loan losses.** We establish a reserve for loan losses in accordance with GAAP by charging a provision for loan losses against income. The reserve reflects our best estimate of known and inherent loan losses, based on subjective judgments about the likelihood that loans will be repaid. . . .

25

*   *   *

In 2009, commercial construction loan balances increased $97.7 million, on average, and $32.6 million on a period-end basis, largely as a result of draw-downs on prior commitments and inroads we made in the Maryland and New Jersey markets. ***In general, commercial construction loans we made in 2009 were related to existing projects, not new projects.*** [Emphasis added.]

52.     On February 23, 2010, defendants conducted the Offering, selling 21.71 million shares of Wilmington Trust common stock at $13.25 per share, for proceeds of over $287 million.  The Underwriter Defendants underwrote the Offering.  In connection with the Offering, defendants filed a prospectus supplement, supplementing a prospectus dated January 12, 2009 which formed part of a Registration Statement that Wilmington Trust filed with the SEC using a "shelf" Registration Process (these documents, collectively, will be referred to as the "Offering Materials").  The Offering Materials incorporated by reference, *inter alia*:

- ***Annual Report on Form 10-K for the year ended December 31, 2009 (which we filed with the SEC on February 22, 2010)***;
- ***Quarterly Reports on Form 10-Q for the quarter ended March 31, 2008 (which were filed with the SEC on May 12, 2008), for the quarter ended June 30, 2008 (which were filed with the SEC on August 11, 2008), and for the quarter ended September 30, 2008 (which were filed with the SEC on November 10, 2008);***
- Forms 8-K filed with the SEC on January 31, 2008, February 19, 2008, March 25, 2008, April 1, 2008, April 18, 2008, June 24, 2008, June 25, 2008, July 18, 2008, September 11, 2008, September 22, 2008, October 17, 2008, October 20, 2008, November 17, 2008, December 16, 2008, and January 7, 2009

53.     The Offering Materials were materially false and misleading when issued because defendants failed to disclose: (1) that Wilmington Trust failed to take timely, adequate and required impairments and accounting write-downs, particularly in its construction-loan portfolio; (2) that as a result, Wilmington Trust's financial statements materially overstated the Company's

assets;   (3) that the Company's financial statements were not prepared in accordance with

GAAP; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a

result of the foregoing, the Company's financial statements and public statements regarding the

Company's financial results were materially false and misleading at all relevant times.

54.    On April 23, 2010, Wilmington Trust issued a press release entitled "Wilmington

Trust Announces 2010 First Quarter Results."  The press release reported that (as of March 31,

2010) the Company reported real estate-construction loans of approximately $1.872 billion.

Additionally, the press release stated:

> Wilmington Trust Corporation (NYSE: WL) reported a loss of
> $29.2 million for the 2010 first quarter. After dividends and
> accretion on preferred stock, the net loss available to common
> shareholders was $33.8 million. On a fully diluted basis, the net
> loss available to common shareholders was $0.44 per share.
>
> *        *        *
>
> Despite these positive trends, economic conditions in Delaware are
> improving more slowly than elsewhere in the mid-Atlantic region.
> Due to uncertainty about the pace of Delaware's recovery, as well
> as credit risk rating downgrades, management added $48.3 million
> to the reserve for loan losses and recorded a provision for loan
> losses of $77.4 million. The amount of the provision, coupled with
> $18.0 million of investment securities impairment charges, reduced
> revenue and resulted in a net loss for the quarter.
>
> *        *        *
>
> ***A comparison of changes in earning assets and net interest
> income illustrates the company's ability to manage through
> considerable changes in loan and investment securities balances
> over the past 12 months.*** For the 2010 first quarter, earning assets
> were $10.1 billion, on average, and net interest income (before the
> provision for loan losses) was $74.7 million. For the year-ago first
> quarter, earning assets were $11.1 billion, on average, and net
> interest income (before the provision) was $78.5 million.
>
> "Compared to the year-ago first quarter, earning assets decreased
> $1.0 billion, or 9%, but the decrease in our net interest income was

only $3.8 million, or 5%," said Mr. Cecala. "This is just one example of how well we are positioned to benefit when the economy recovers and short-term market interest rates rise."

**Credit quality**
Nonperforming assets increased during the 2010 first quarter, but the increase was the lowest since the 2008 third quarter. Compared to the trailing quarter, the reserve for loan losses was higher, while the provision for loan losses, net charge-offs, and the net charge-off ratio were lower. [Emphasis added.]

55.     On May 10, 2010, Wilmington Trust filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Cecala and Gibson, and reaffirmed the Company's financial results previously announced on April 23, 2010.   The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 37, *supra*.

56.     On June 3, 2010, Wilmington Trust announced that Defendant Cecala would retire from the Company.  Defendant Foley was to assume the role of CEO immediately, with Cecala remaining as Chairman until July 19, 2010.  Then, on July 21, 2010, the Company announced that Defendant Foley had been unanimously elected by the Board to be the Company's new Chairman, in addition to his role as CEO.

57.     On July 23, 2010, the Company issued a press release entitled "Wilmington Trust Announces 2010 Second Quarter Results."  At June 30, 2010, real estate-construction loans were approximately $1.756 billion.  The press release further set forth, in relevant part:

Wilmington Trust Corporation (NYSE: WL) reported a loss of $116.4 million for the 2010 second quarter. After dividends and accretion on preferred stock, the net loss available to common shareholders was $120.9 million, or $1.33 per share.

The primary cause of the loss was the amount of the provision for loan losses, which rose to $205.2 million, following increases in nonperforming loans, loan charge-offs, and loans with unfavorable

risk ratings. ***Other contributing factors were $18.8 million of credit-related expenses and $7.7 million of securities losses.***

\*       \*       \*

Management's assessment of these factors and economic conditions overall led to an increase in the reserve for loan losses and other actions to reduce risk in the loan portfolio.

"My priority is to return our company to profitability and position our businesses for future growth, but first we must continue to deal with the lingering effects of a weak economy and housing market. Our second quarter results demonstrate we are doing that," said Donald E. Foley, Wilmington Trust's chairman and chief executive officer. "We are fully committed to working through our credit issues, relying on robust risk management tools and analyses.

"At the same time, we remain focused on our strong relationships with clients, and on capitalizing on opportunities to increase revenue from our advisory businesses," Mr. Foley added. "We have the market positions, capital strength, and talented people to accomplish these objectives. While no one can predict when economic conditions will improve, we will manage our credit challenges effectively and, over the coming months, begin to position our company to capitalize fully on its many strengths."

**2010 SECOND QUARTER SUMMARY**

• Net charge-offs were $131.2 million, an increase of $102.1 million from the 2010 first (trailing) quarter.

\*       \*       \*

• The company's capital position remained strong. All regulatory capital ratios continued to exceed those required by the Federal Reserve for banks to be considered well capitalized.

• The ratio of total risk-based capital to total risk-weighted assets was 16.65%, compared with the 10.00% required to be considered well capitalized.

• The amount of total risk-based capital was $1.64 billion. This was $656.9 million more than the amount required to be considered well capitalized. [Emphasis added.]

58.    On August 9, 2010, Wilmington Trust filed its Quarterly Report with the SEC on

Form 10-Q.  The Company's Form 10-Q was signed by Defendants Foley and Gibson, and reaffirmed the Company's financial results previously announced on July 23, 2010.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 37, *supra*, but with Defendant Foley signing the CEO certification.

59.     The statements contained in ¶¶ 35-51, 54-55 and 57-58 were materially false and misleading when made because defendants failed to disclose or indicate the following:  (1) that Wilmington Trust failed to take timely, adequate and required impairments and accounting write-downs, particularly in its construction-loan portfolio; (2) that as a result, Wilmington Trust's financial statements materially overstated the Company's assets;  (3) that the Company's financial statements were not prepared in accordance with GAAP; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements and public statements regarding the Company's financial results were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

60.     Late in the day on Friday, October 22, 2010, Wilmington Trust issued a press release stating that, in response to "unusual market activity in its common stock," the Company "said today that its policy is not to comment on unusual market activity or speculation."

61.     By Monday, October 25, analysts began to surmise that Wilmington Trust would be taken over.  According to Janney analyst Stephen Moss, "Wilmington Trust may receive $8 [per share] in a favorable takeover scenario, though they may get much less."

62.     On this news, Wilmington Trust shares declined $1.06 per share, or 12.10 percent, to close on October 25, 2010 at $7.70 per share, on heavy trading volume.

63.    Then, on November 1, 2010, Wilmington Trust shocked investors when it issued

two related press releases.  The first press release, entitled "Wilmington Trust Announces 2010

Third Quarter Results," reported dismal quarterly results.  This press release stated, in relevant

part:

> Wilmington Trust Corporation (NYSE: WL) reported a loss of
> $365.3 million for the 2010 third quarter. After dividends and
> accretion on preferred stock, the net loss available to common
> shareholders was $369.9 million, or $4.06 per share.
>
> ***The primary causes of the loss were:***
> • ***Continued deterioration in commercial credit quality, which
> resulted in a loan loss provision of $281.5 million.***
> • Income tax expense of $100.7 million, as the company
> established a valuation allowance on deferred tax assets.
>
> At September 30, 2010, the company remained well capitalized
> and had sufficient liquidity.
>
> ***"Our third quarter loss was primarily the result of two factors.
> First, we continued to see credit deterioration in our loan
> portfolio, reflecting the extent of our exposure to real estate
> construction lending and its concentration in Delaware.*** Second,
> our continued losses required us to establish a significant tax
> valuation allowance. The result of both of these developments was
> a loss that clearly exceeded our expectations," said Donald E.
> Foley, Wilmington Trust chairman and chief executive officer.
>
> "We have strengthened our credit risk management practices, and
> our provisioning and reserve levels reflect the increased risk in our
> loan portfolio," Mr. Foley added. "However, there is no significant
> economic or real estate recovery on the horizon in our markets.
> Therefore, we have little assurance that our loan portfolio will
> strengthen significantly in the near term, or that our capital
> position will not erode further. These risks increase the possibility
> of downgrades by the credit rating agencies or adverse regulatory
> actions which could compromise our businesses.
>
> "We have two very strong fee-based businesses that continue to
> perform well, are established leaders in their markets and have
> solid growth prospects for the coming years. We believe it is
> important to do all we can to protect and nourish those businesses
> as well as address the issues in our banking franchise. ***"For all***

*these reasons, management and the Board of Directors have carefully studied the company's strategic options, and we reviewed a wide range of alternatives. Ultimately, the Board determined that the best option for our shareholders, as well as our clients and the employees of Wilmington Trust, was a merger with M&T. We announced separately this morning that Wilmington Trust and M&T have signed a definitive merger agreement.* This agreement is subject to certain conditions, including approval by shareholders and regulators.

"With a history of superior earnings and credit performance across economic cycles, M&T is one of the strongest financial institutions in the country and a strong and stable partner for Wilmington Trust. With highly complementary operations and geographic footprints as well as many value-enhancing opportunities across our businesses, Wilmington Trust and M&T are an excellent strategic fit," Mr. Foley concluded. "We anticipate that our Wealth Advisory Services and Corporate Client Services businesses will continue to operate under the Wilmington Trust brand, with expanded access to M&T's clients and markets. M&T will merge our top-ranked commercial bank in Delaware with its own banking footprint to create the premier depository franchise in the mid-Atlantic region. Wilmington Trust and M&T share a similar community-focused operating model, long-tenured staff members, and a culture committed to serving the areas where we live and work." [Emphasis added.]

64.     The second press release, entitled "Wilmington Trust to Merge with M&T Bank Corporation," further elaborated on the merger. Perhaps most shocking to investors was that the value of the merger was $3.84 per Wilmington Trust share, or approximately one-half of the price Wilmington Trust closed at on the prior trading day ($7.11 per share). At the close of the market on the prior trading day, Wilmington Trust shares had closed at $7.11 per share. This press release stated, in relevant part:

M&T Bank Corporation (NYSE:MTB)("M&T") and Wilmington Trust Corporation (NYSE:WL)("Wilmington Trust") announced jointly today that they have entered into a definitive agreement under which Wilmington Trust will merge with M&T, forming one of the largest and strongest banks in the eastern United States, a national leader in wealth management and a premier global provider of financial services to corporate clients.

> *Under the terms of the merger agreement, Wilmington Trust common shareholders will receive 0.051372 shares of M&T common stock in exchange for each share of Wilmington Trust common stock they own in a stock for stock transaction valued at $351 million* (with the price and exchange ratio based on M&T's closing price of $74.75 per share as of October 29, 2010), plus the assumption of $330 million in TARP preferred stock.

\*        \*        \*

> **Transaction Details**
> *The transaction is valued at $3.84 per Wilmington Trust share. The purchase price represents 1.0x tangible book value as of September 30, 2010.* M&T anticipates that the transaction will be accretive to GAAP and operating earnings per share in 2012, and estimates its internal rate of return on the investment to exceed 20%. [Emphasis added.]

65.     On this news, shares of the Company's stock fell $2.90 per share, or 40.79 percent, to close on November 1, 2010 at $4.21 per share, on unusually heavy trading volume.

66.     A November 1, 2010 article in *The New York Times* entitled "M&T Bank to Buy Wilmington Trust" set forth the following:

> M&T Bank said Monday that it would pay about $351 million to buy the beleaguered Wilmington Trust, whose loan portfolio has been deteriorating with no end in sight.

> The deal comes after Wilmington Trust, based in Wilmington, Del., posted a net loss of $369.9 million in the third quarter because of bad real estate construction loans in Delaware. The bank said future losses were likely.

> The Wilmington Trust chairman and chief executive, Donald E. Foley, said the board examined numerous alternatives, held talks with a number of potential partners and felt the deal with M&T was the best option for its stockholders.

> Wilmington Trust investors dumped the stock on Monday. The bank's shares tumbled $2.90, or 41 percent, to $4.21 in afternoon trading. Shares of M&T rose $2.72, or 3.6 percent, to $77.47.

> Wilmington Trust said it set aside $281.5 million for loan losses, up 37 percent from the previous quarter. Nonperforming assets

climbed more than three-quarters, to $988.6 million, from the second quarter and represented 12 percent of all loans.

Under terms of the deal, M&T said Wilmington Trust shareholders would receive about 0.05 shares of M&T stock for each share of Wilmington Trust.

M&T also will take a $500 million fair value adjustment to Wilmington's loan portfolio, following $500 million in write-downs before the deal closes, according to a Standard & Poor's statement on the transaction. That will serve to insulate M&T from continuing losses in the portfolio.

S.& P. affirmed M&T's investment grade ratings on Monday and maintained its negative outlook for the ratings after the deal's announcement. The agency also affirmed Wilmington Trust's noninvestment grade ratings, but put them on credit watch with positive implications.

M&T expects to add $8.3 billion in deposits and $8.1 billion in loans after the deal. It will operate 800 branches in eight states, the District of Columbia and Ontario.

## WILMINGTON TRUST'S VIOLATION OF GAAP RULES IN ITS FINANCIAL STATEMENTS FILED WITH THE SEC

67.     These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its assets, in violation of GAAP rules.

68.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with

34

GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

69.    Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)    The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources

entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

70.     The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Wilmington Trust securities during the Class Period (the "Class"), including purchasers of the Company's securities pursuant or traceable to the Company's Offering on or about February 23, 2010.  Excluded from the Class are defendants, directors and officers of Wilmington Trust and their families and affiliates.

72.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits

to the parties and the Court.  According to the Company's Form 10-K filed with the SEC on February 22, 2010, Wilmington Trust had over 69 million shares of stock outstanding, owned by thousands of persons.

73.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Securities Act and/or Securities Exchange Act were violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the prices of Wilmington Trust securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

74.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

75.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

77.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Wilmington Trust's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Wilmington Trust securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

78.     During the Class Period, the Company and the Officer Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, these defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Wilmington Trust's securities during the Class Period.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

79.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

> (a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

> (b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Wilmington Trust securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

80.     At all relevant times, the market for Wilmington Trust securities was efficient for the following reasons, among others: (a)     as a regulated issuer, Wilmington Trust filed periodic public reports with the SEC; and (b) Wilmington Trust regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

**NO SAFE HARBOR**

81.     Defendants' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

82.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Wilmington Trust who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic

performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

83.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' liability for making false and materially misleading statements in the Offering Materials.

84.     This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's securities pursuant to or traceable to the false Offering Materials issued in connection with the Company's February 23, 2010 Offering.

85.     This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Materials and within three years of the effective date of the Offering Materials.

86.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages from the defendants and each of them, jointly and severally.

## SECOND CLAIM
### Violation of Section 12(a)(2) of
### The Securities Act Against Wilmington Trust and the Underwriter Defendants

87.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' liability for making false and materially misleading statements in the Offering Materials.

88.     Wilmington Trust and the Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Offering Materials.

89.     This action is brought within three years from the time that the securities upon which this Count is brought were sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

## THIRD CLAIM
### Violation of Section 15 of The Securities Act
### Against the Individual Defendants

90.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' liability for making false and materially misleading statements in the Offering Materials.

91.     The Individual Defendants, by virtue of their positions and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Wilmington Trust within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the

power and influence and exercised the same to cause Wilmington Trust to engage in the acts described herein.

92.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## FOURTH CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Wilmington Trust and the Officer Defendants

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94.     During the Class Period, Wilmington Trust and the Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Wilmington Trust securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each of them, took the actions set forth herein.

95.     Wilmington Trust and the Officer Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Wilmington Trust securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

## FIFTH CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Officer Defendants

96.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

97.     The Officer Defendants acted as controlling persons of Wilmington Trust within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.     In particular, each of the Officer Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

99.     As set forth above, Wilmington Trust and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: November 23, 2010                    ROSENTHAL, MONHAIT & GODDESS, P.A.


                                            /s/ P. Bradford deLeeuw
                                            Norman Monhait (Del. Bar No. 1040)
                                            P. Bradford Deleeuw (Del. Bar No. 3569)
                                            919 Market Street, Suite 1401
                                            P.O. Box 1070
                                            Wilmington, DE 19899
                                            (302) 656-4433
                                            (302) 658-7567 (fax)
                                            nmonhait@rmgglaw.com
                                            bdeleeuw@rmgglaw.com

                                            *Attorneys for Plaintiff*

*Of Counsel:*

**BARROWAY TOPAZ KESSLER**
**MELTZER & CHECK, LLP**
D. Seamus Kaskela
skaskela@btkmc.com
David M. Promisloff
dpromisloff@btkmc.com
280 King of Prussia Road
Radnor, PA 19087
(610) 667 – 7706
(610) 667 – 7056 (fax)

**BRODSKY & SMITH, LLC**
Evan J. Smith
esmith@brodsky-smith.com
Two Bala Plaza
Suite 602
Bala Cynwyd, PA 19004
(610) 667 – 6200
(610) 667 – 9029 (fax)